```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| JAMES CARLINI,<br><br>          Plaintiff,<br>     v.<br><br>JENNIFER VELEZ, COMMISSIONER,<br>NEW JERSEY DEPARTMENT OF HUMAN<br>SERVICES, et al.<br><br>          Defendants | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 12-7290<br>        (JEI/KMW)<br><br>**OPINION** |

**APPEARANCES:**

ROTHKOFF LAW GROUP
By: Jane Fearn-Zimmer
911 Kings Highway South
Cherry Hill, NJ 08034
     Counsel for Plaintiff

STATE OF NEW JERSEY, OFFICE OF THE ATTORNEY GENERAL
By: Jennifer Lauren Finkel
P.O. Box 112
25 Market Street
Trenton, NJ 08625
     Counsel for Defendants


**IRENAS,** Senior District Judge:

   Plaintiff James Carlini initiated this action on November 26, 2012, by filing a Complaint against Jennifer Velez in her capacity as Commissioner of the New Jersey Department of Human Services, and Valerie Harr in her capacity as the Director of the Division of Medical Assistance and Health Services. The Complaint alleges that Defendants violated Plaintiff's rights

under 28 U.S.C. § 1983 by denying him benefits under New Jersey's Medical Assistance, or Medicaid, Program.[1]  Pending before the Court is Plaintiff's Motion for a Preliminary Injunction.  For the reasons discussed below, Plaintiff's motion will be granted.

**I.**

Plaintiff James Carlini currently resides in the skilled nursing unit at the Palace in Maple Shade.  Mr. Carlini is considered the "institutionalized spouse" for Medicaid purposes.

Plaintiff's wife, Mary Carlini, currently resides at Sunrise of Newtown Square, a senior living commmunity.  (Pl.'s Reply Mem., at 4.)  Mrs. Carlini is considered the "community spouse" for Medicaid purposes.

On or about January 31, 2012, Mrs. Carlini purchased an annuity (the "Annuity") in the amount of $310,000.  (Def.'s Mem. in Opp., at 1.)  The Annuity was issued by the PHL Variable Insurance Company, and calls for equal monthly payments in the amount of $8,617.75 to Mrs. Carlini for a period of thirty-six months.  (Pl.'s Reply Mem., at 2.)  Mrs. Carlini's life expectancy at the time she purchased the Annuity was 10.03 years, and thus the Annuity is actuarially sound.  (Compl. ¶ 17.)  Additionally, the Annuity is permanently irrevocable, and non-transferrable.  (Compl. Ex. A.)

---

[1]  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

The Annuity names the State of New Jersey as the first remainder beneficiary, stating:

> [b]eneficiary in the first position is to be the State of New Jersey as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual (irrevocably).

(Pl.'s Reply Mem., at 2). Section six of the Annuity ("Section Six") further states that:

> [i]n all cases in which a payment is to be made to the State, a representative from the State is required to provide reasonable documentation concerning the amount to be paid to the State. [The PHL Variable Insurance Company] reserve[s] the right to require that the representative from the State and either a representative from the estate of the Owner, the Secondary Beneficiary, or the Contingent Beneficiary agree to the amount to be paid to the State."

(*Id.*, at 3).

In April, 2012, Mr. Carlini applied for Medicaid long term care benefits under the Medically Needy Program. (Def.'s Mem. in Opp., at 2.) The Medically Needy program "extends limited Medicaid program benefits to certain groups of medically needy persons whose income and/or resources exceeds the standards for the [regular] Medicaid program." N.J.A.C. 10:71-1.1. Initially, the Burlington County Welfare Agency (the "CWA") determined that the Annuity purchased by Mrs. Carlini was an available and countable asset in excess of the Community Spouse Resource Allowance. (Compl. Ex. E.) As a result, Mr. Carlini's

application for benefits under the Medically Needy Program was denied. (*Id*.)

In reaction to this determination, Mr. Carlini initiated the instant lawsuit, alleging that the Annuity was Medicaid compliant and that the CWA improperly determined the Annuity was an available asset. (Compl. ¶ 37.) On January 16, 2013, Mr. Carlini moved to preliminarily enjoin the defendants from treating the Annuity as an available asset or as an impermissible transfer of assets. (Notice of Mot.)

On January 24, 2013, the CWA issued a revised eligibility letter. (Pl.'s Reply Mem. Ex. D.) In this revised eligibility letter, the CWA found that Mr. Carlini was eligible for benefits as of April 1, 2012; however, Mr. Carlini was subject to a thirty-nine month and twenty-nine day penalty period because the Annuity was found to be a transfer of assets for less than fair market value. (*Id.*; Def.'s Mem. in Opp., at 12.)

Because the CWA's revised eligibility determination of January 24, 2013, found that Mr. Carlini was eligible for Medicaid benefits as of April 1, 2012, that section of his motion asking the Court to enjoin Defendants from treating the Annuity as an available asset is moot. Still at issue is whether the Court should enjoin Defendants from treating the annuity as an impermissible transfer of assets subject to a penalty period. Oral argument on this issue was held on May 28, 2013.

**II.**

In determining whether to grant a preliminary injunction, the Court must consider: (1) the movant's likelihood of success on the merits; (2) the probability of irreparable harm to the moving party if immediate relief is not granted; (3) the potential harm to the non-moving party; and (4) the public interest. *Kraft Power Corp. v. General Elec. Co.*, 2011 WL 6020100, at *3 (D.N.J. 2011) (citing *Allegheny Energy Inc. v. DOR. Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)). The Court will consider each factor in turn.

**A.  Likelihood of Success on the Merits**

To establish a likelihood of success on the merits, "the moving party need not demonstrate that its entitlement to a final decision after trial is free from doubt. Rather, the moving party must demonstrate a reasonable probability of eventual success in the litigation." *Freightliner Inc. v. Freightliner Corp.*, 987 F. Supp. 289, 295 (D.N.J. 1997) (internal quotations omitted). The issue in the instant case, then, is whether Mr. Carlini will likely prove that the Annuity does not constitute a transfer of assets for less than fair market value.

The Medicare Catastrophic Coverage Act of 1988 (the "MCCA"), 42 U.S.C. § 1396 *et seq.*, sets forth the rules that the CWA must

5

follow when determining an applicant's eligibility for Medicaid. The spousal impoverishment provisions of the MCCA permit a spouse living at home, referred to as the community spouse, "'to reserve certain income and assets to meet the minimum monthly maintenance needs he or she will have while the other spouse is institutionalized.'" *Weatherbee ex rel. Vecchio v. Richman*, 595 F. Supp. 2d 607, 610-11 (W.D.Pa. 2009), *aff'd*, 351 Fed. Appx. 786 (3d Cir. 2009) (quoting *Wisconsin Dep't of Health and Family Services v. Blumer*, 534 U.S. 473 (2002)). The purpose of the MCCA is to "protect community spouses from becoming impoverished while simultaneously barring financially secure couples from sheltering their resources in order to qualify for Medicaid." *Id*. at 611.

"In determining Medicaid eligibility for the institutionalized spouse, the MCCA treats the assets and income of the community spouse in separate and distinct ways." *Id*. The community spouse is permitted to retain a standard amount of assets, called the "community spouse resource allowance." *Id*. However, any assets retained by the community spouse exceeding the community spouse resource allowance are deemed available to the institutionalized spouse. 42 U.S.C. § 1396r-5(c)(2). In contrast, a community spouse's income is not considered when determining the institutionalized spouse's Medicaid eligibility. 42 U.S.C. § 1396r-5(b)(1) ("[N]o income of the community spouse

shall be deemed available to the institutionalized spouse.").

An annuity is a contract which allows the purchaser to receive monthly payments for an agreed upon period of time in exchange for the payment of a lump sum.  In 2005, Congress passed the Deficit Reduction Act (the "DRA"), which restricted the use of annuities by Medicaid applicants in order to prevent applicants from sheltering their assets in anticipation of Medicaid eligibility.  *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 6012 (2005), codified as amendments to 42 U.S.C. § 1396p.

42 U.S.C. § 1396p(c)(1)(G) establishes the general rule that an annuity is an asset.  However, § 1396p(c)(1)(G) also establishes that if an annuity is irrevocable and nonassignable, actuarially sound, and provides for payments in equal amounts during the term of the annuity, with no deferral and no balloon payments, then the Annuity is not to be considered an asset.  In addition to these requirements, § 1396p(c)(1)(F) mandates that an annuity must be treated as the disposal of an asset for less than fair market value unless the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid, or the State is named as such a beneficiary in the second position after the community spouse or minor or disabled child.  Thus, when an annuity fails to name the State as a remainder beneficiary in accordance with

7

§ 1396p(c)(1)(F), an otherwise eligible Medicaid applicant must face a penalty period before receiving benefits. 42 U.S.C. § 1396p(c)(1)(A).[2]

In the instant case, the defendants' position is that the CWA correctly imposed a penalty period because the Annuity does not name the State of New Jersey as a remainder beneficiary in accordance with § 1396p(c)(1)(F). Specifically, defendants take issue with the sentence in Section Six of the Annuity that states that "[the PHL Variable Insurance Company] reserve[s] the right to require that the representative from the State and either a representative from the estate of the Owner, the Secondary Beneficiary, or the Contingent Beneficiary agree to the amount to be paid to the State." At oral argument, counsel for defendants stated that this sentence was the only provision preventing the Annuity from being compliant with the DRA, and that the Annuity "would be fine" if that sentence were not included. (Oral

---

[2] In full, this subsection states: "In order to meet the requirements of this subsection for the purposes of section 1396(a)(18) of this title, the State plan must provide that if an institutionalized individual or the spouse of such an individual (or, at the option of a State, a noninstitutionalized individual or the spouse of such an individual) disposes of assets for less than fair market value on or after the look-back date specified in subparagraph (B)(i), the individual is ineligible for medical assistance for services described in subparagraph (C)(i) (or, in the case of a noninstitutionalized individual, for the services described in subparagraph (C)(ii)) during the period beginning on the date specified in subparagraph (D) and equal to the number of months specified in subparagraph (E)." 42 U.S.C. § 1396p(c)(1)(A)

Argument at 26:18-20, 27:21, May 28, 2013.)  Defendants have not argued that requiring the State to verify the amount of medical assistance paid affects the eligibility determination.[3]

Mr. Carlini's position is that despite the language in Section Six concerning the consent of a representative from the estate of the owner, the secondary beneficiary, or the contingent

---

[3] Technically, § 1396p(c)(1)(G) applies to assets purchased "by or on behalf of an annuitant who has applied for medical assistance."  Without addressing this language, the Third Circuit held in *Weatherbee* that an annuity purchased by the community spouse which satisfied the requirements of §§ 1396p(c)(1)(F) -(G) could not be treated as an available asset to the institutionalized spouse or as an improper transfer of assets. 351 Fed. Appx. 786 (3d Cir. 2009).

In the instant case, the Court does not have occasion to address the import of the "by or on behalf of an annuitant who has applied for medical assistance" language because all parties agree that Mr. Carlini would be immediately eligible for Medicaid benefits under the Medically Needy Program if the language concerning consent were stricken from Section Six.  Nonetheless, the Court is aware of the possibility that §§ 1396p(c)(1)(F)-(G) may not apply to annuities purchased by a community spouse. *See Hughes v. Colbert*, 872 F. Supp. 2d 612, 621 (N.D. Ohio 2012) (stating that Medicaid's annuity provisions do not apply to a community spouse).  Allowing §§ 1396p(c)(1)(F)-(G) to apply to annuities purchased by a community spouse creates a potentially large loophole in the Medicaid laws by allowing a Medicaid applicant to turn a countable asset into income for the community spouse, which is not deemed available to the institutionalized spouse.  Thus, reading §§ 1396p(c)(1)(F)-(G) as applying only to annuities purchased by and for the benefit of the Medicaid applicant could potentially limit this loophole.  Although this reading would still allow a Medicaid applicant to turn an asset into income, the income would now belong to the applicant, and thus be considered when determining Medicaid eligibility.

Further § 1396p(c)(1)(G) is one of the only places within § 1396p to identify an asset based on the purchaser.  In this context, the Court finds it unusual to simply ignore this language, especially given that a major purpose of the DRA is to prevent Medicaid applicants from sheltering their assets.

beneficiary, Section Six is no more than a verification provision. (*See* Pl.'s Reply Mem., at 7-10). Further, at oral argument, counsel for Mr. Carlini stated that to the extent that Section Six creates an authority to consent, Mr. Carlini would "gladly waive" that authority. (Oral Argument at 21:1-10.)[4] The PHL Insurance Company agrees with Mr. Carlini's reading of Section Six, stating in a letter submitted to the Court by Mr. Carlini that Section Six "does not indicate that we will refuse to pay the State an amount claimed; it only relates to our requesting information to verify that amount." (Letter from Laurie Lewis, February 15, 2013, Dkt. No. 10.)

Because all parties agree that the Annuity would not be considered an improper transfer absent the consent language in Section Six, and because both Mr. Carlini and the PHL Insurance Company concede that Section Six does not give the estate representative, secondary beneficiary, or contingent beneficiary an authority to consent, the Court reads Section Six as no more than a verification provision. With this interpretation, it is

---

[4] In full, counsel stated: "Your Honor, we have no problem waiving that contractual obligation, which we even - which has been discussed in the past. We have no problem waiving that, okay, because there's no benefit, whatsoever, I would agree with you, to our client. Our client would gladly waive that authority to consent, Your Honor. Because there's - we see no benefit. The State is entitled to payment. If this was - currently the annuity has been paying out for approximately 16 months to date, Your Honor. So that would mean there's only 22 months remaining."

10

clear that Mr. Carlini has shown that he will likely be able to prove that the Annuity is not a transfer of assets for less than fair market value because all parties agree that the Annuity is compliant with the DRA absent the authority to consent.

B. **Irreparable Harm**

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be adequately compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000).

This requirement is satisfied in the instant case. The Eleventh Amendment "gives the state immunity from an award of retroactive benefits, except for the three months immediately preceding an outcome in [Plaintiff's] favor." *Sorber v. Velez*, 2009 WL 3591154, at *3 (D.N.J. 2009) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)). Therefore, Mr. Carlini will not be able to obtain full monetary compensation at trial, and will be irreparably harmed by a failure to award to a preliminary injunction.

C. **Harm to the Defendant**

"If granting the injunction will cause greater harm to the Defendant than the Plaintiff would suffer if the injunction were

denied, the Court should generally not grant the injunction." *Sorber*, 2009 WL 3591154, at *4. Defendants assert that "it would be significant harm to Medicaid programs across this country if New Jersey was enjoined from properly applying Medicaid statutes in determining eligibility." (Def.'s Mem. in Opp., at 18.) However, since all parties agree that without the authority to consent, the Annuity is compliant with the DRA, granting the preliminary injunction in this case does not prevent New Jersey from properly applying Medicaid statutes in determining eligibility.

D. **The Public Interest**

"The last prerequisite for granting a preliminary injunction is that granting the injunction must be in the public interest." *Id*. Plaintiff and Defendants both argue in their briefs that the public has an interest in ensuring that Medicaid statutes are enforced correctly and equitably. In this case, all parties agree that the correct enforcement of the Medicaid statutes requires the State to begin paying benefits to Mr. Carlini so long as the estate representative, secondary beneficiary and contingent beneficiary do not have any authority to consent. Therefore, the public interest weighs in favor of granting the preliminary injunction.

## III.

In conclusion, Plaintiff has showed that all four requirements for the granting of a preliminary injunction are satisfied in this case. Therefore, Plaintiff's motion is granted. An appropriate order will accompany this Opinion.


Dated: June __4__, 2013      ____s/Joseph E. Irenas_____

                             **Joseph E. Irenas, S.U.S.D.J.**